## Case No. 4,290.

### The EDWARD ALBRO.

[10 Ben. 668.][1]

District Court, S. D. New York. Dec., 1879.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

W. W. Goodrich, for libellant.
F. A. Wilcox, for claimant.

CHOATE, District Judge. This is a suit by Joseph Grady, upon a bottomry bond executed at Cape Town, South Africa, by the master of the British bark Edward Albro, on the 10th day of July, 1877, for £687 16s 11d. The bond is upon the vessel and her freight for the voyage from Cape Town to New York. Soon after her arrival in ·this port and on the 14th of September, 1877, this libel was filed. The bark belongs to Pictou, Nova Scotia, but her equitable or real owner is a resident of New York. The vessel being attached on process, the registered owner appeared as claimant and has answered. Besides some defences on the merits, the claimant makes by exception and answer certain objections to the libel and to the bond, which will be first disposed of.

It is objected that the instrument sued on is not a bottomry bond but a mortgage. Undoubtedly, this court has no jurisdiction to enforce a mortgage, and if such is the real nature of this instrument the libel must be dismissed. Bogert v. The John Jay, 17 How. [58 U. S.] 402; Maitland v. Atlantic [Case No. 8,980]; The Emancipation, 1 W. Rob. Adm. 124. The distinguishing characteristic of a bottomry bond is that the payment of the sum secured thereby is conditioned upon the safe arrival of· the vessel, the lender taking all the risk of her loss upon the voyage, and this is the consideration that justifies the extraordinary or maritime interest reserved on such contracts. Same cases; also, The Atlas, 2 Hagg. Adm. 57. And whether or not an instrument is a mortgage or a bottomry bond must be determined, as in case of all other written instruments, by the terms of the agreement itself, without regard to extrinsic proof of the intention of the parties. Cases last cited. It is enough, however, that upon the entire instrument the intention of the parties appears that the lender shall take the risk of the safe arrival ·of the vessel. There is no prescribed form of a bottomry bond and the courts of admiralty, recognizing the fact that the forms ·of these instruments used in different countries differ, have given to them a liberal ·construction to effect the intention of the parties. The Nelson, 1 Hagg. Adm. 176. See, also, Simonds v. Hodgson, 3 Barn. & Adol. 50; The Tartar, 1 Hagg. Adm. 14. So, too, it is no objection to a bottomry bond that a draft or bill of exchange is also given for the amount. It is in some countries usual for the master to draw for the amount, and the drawing of such a bill as collateral security does not vitiate the bond. The Nelson, ut supra; The Jane, 1 Dod. 466; The Emancipation, ut supra.

Applying these well-settled rules to the present case, the instrument here sued on is undoubtedly a bottomry bond. It commences as follows: "Know all men by these presents, that I, William Reimer, master of the barque or vessel called the Edward Albro, of the burden of 394 tons or thereabouts, now lying in Table Bay, am held and firmly bound unto and on behalf of Joseph Grady, of Cape Town, merchant, etc., carrying on business under the style of Jos. Grady & Company, in the penal sum of nine hundred pounds sterling of lawful money, to be paid to the said Joseph Grady & Company, their certain attorney, order or endorser of this bond, for which payment to be well and truly made I, the said William Reimer, do hereby specially bind, mortgage, pledge and hypothecate the said ship, Edward Albro, her tackle, apparel, furniture and appurtenances, together with the freight to become due and payable in respect of the cargo laden on board during the voyage of the said vessel from this port bound to New York, firmly by these presents. Sealed with my seal, dated at Cape Town," etc. The bond then recites that the vessel, on her voyage from Geffle to Cape Town, met with very severe and boisterous weather and sustained considerable damage, and was compelled in consequence to expend a considerable sum of money in repairs and necessary supplies to enable her to leave Cape Town and continue her voyage to New York, the port of her owners; that the master, not having sufficient funds for defraying the expenses of repairs, stores and supplies and other necessary expenses at that port, advertised for tenders for the sum required "on bottomry of the said vessel, cargo and freight;" that Joseph Grady & Co. agreed to advance the sum required on more satisfactory terms than any tender put in; that the master had received from them the full amount of £687 16s 11d, to defray the expenses of the ship, and enabled her to proceed to sea, "on bottomry of the said ship, her tackle, apparel, furniture and appurtenances, together with the freight to become due and payable, during the hereinafter mentioned voyage in respect thereof." The bond then contains the following clause: "In consideration whereof, the usual risks of the seas, enemies, pirates, utter loss from fire and all other casualties of navigation, are to be for and on account and risk of the said Joseph Grady and Company." The bond then further recites that the master has signed and delivered a set of bills of exchange for the sum of £687 16s 11d, dated at Cape Town the 9th day of July, 1877, drawn and signed by him upon A. Speirs Brown, of New York (the equitable owner of the vessel), payable at seven days after sight to the order of Jos. Grady & Co.

It then concludes as follows: "Now the condition of this bond is such, that if the said bills of exchange or any one of them shall be well and truly accepted upon presentation and paid within seven days thereafter, then this obligation shall be null and void and of no force or effect, but otherwise shall be and remain in full force and virtue, I, the said William Reimer, for and on behalf of myself and the owners, hereby contracting, agreeing and engaging that the said ship, her tackle, apparel and furniture and appurtenances, and the freight as aforesaid, shall, in the event of such non-payment, at all times be liable and chargeable for the payment of this bond, together with maritime interest at the rate of twenty-five pounds per centum per annum, and all costs and charges which may attend the recovery thereof, and that the taking of such bills of exchange (if not paid) shall not in any way vitiate or prejudice this bond. In witness whereof," etc., etc. The bill of exchange referred to in the bond was in the following form: "At seven days after sight of this first bill of exchange, etc., pay to the order of Joseph Grady & Co. the sum of £687 16s 11d, value received, in advances to defray expenses of the barque Edward Albro, secured by bottomry bond, to be surrendered on due payment of this draft, on or within seven days after presentation, and which charge, with or without advice, to account of Wm. Reimer, master." Little need be said, it seems to me, about the form of the bond. As the use of the word "bottomry" in an instrument will not make it a bottomry bond, if the evident intention is to make the agreement to pay absolute and not dependent on the safe arrival of the vessel, so the use of the word "mortgage," as in this instrument, cannot have the effect to make it a mortgage instead of a bottomry, if upon view of all its provisions the contrary intent is apparent. Reading the formal condition alone, it might seem that the only case in which the bond was to fail was the non-acceptance or non-payment of the draft; but if effect is given to all its provisions, it is obvious that this is not so. The express provision that Joseph Grady & Co. are to assume all the usual risks of the seas, etc., was evidently inserted for the very purpose of attaching to the contract the condition of the safe arrival of the ship, and this provision cannot be ignored. This clause and the condition can, without difficulty, be construed together. If the draft is paid, the bond is discharged; if not, the bond is to be enforced. But what bond? Why, of course, not the absolute promise to pay, but the bond as it is, with all its conditions and qualifications, one of which is that the obligee takes all the usual risks of the seas, and of the loss of the ship upon the voyage by fire or other casualty. The exceptions to the libel, therefore, so far as they are based on the theory that this was not a bottomry bond, are disallowed.

A further exception is taken that the rate of interest reserved was usurious. This objection necessarily falls with the other. An exception is also taken that it does not appear on the libel that the master made any efforts to procure advances on the credit of the owner, or that he communicated with the owner that such advances were needed and that he had made efforts without success to procure the same on the credit of the vessel before the execution of the bond. The libel does allege the need of funds and that the master "having no other means of procuring the same, after duly and publicly advertising therefor, borrowed the aforesaid sum of the libellant on bottomry," etc. Correct pleading requires that the material facts should be stated, not by way of recital merely, but positively, and if this exception had been brought on before the trial of the cause, it would be proper to have sustained it, in order to compel the libellant to state the fact that there were no other means within the control of the master positively; but by going to trial on the merits, it seems to me that the claimant has waived this merely technical objection, and if he has not, that the libel should now be allowed to be amended to conform the pleadings to the facts, without imposing any terms. I think a distinct and positive averment that the master had no other means of procuring the money except by bottomry, is a sufficient averment of the necessity for giving the bond, and that the libellant need not allege that the master communicated with the owner. Whether the master is bound to communicate with the owners, or not, before executing a bottomry bond, depends upon circumstances, and it seems more proper, if the claimant insists that the circumstances require it, that this should be set up by way of defence. The Olivier, Lush. 484. In the first instance, it is enough for the libellant to allege the necessity for repairs and supplies, and that the master was without means of procuring them. The Eureka [Case No. 4,-547]. The exceptions to the libel are therefore overruled.

Upon the merits, several defences are attempted which may be reduced to these: (1) that the bond is void because of fraud on the part of the libellant; (2) that it is void for want of a communication with the owner; (3) that the master had other means to meet all the proper expenses of the ship; (4) that, as to some part of the expenses included in the bond, they were not incurred on the credit of the vessel, and as to some that they are exorbitant.

As to the defence of fraud, there is, I think, no sufficient evidence to impeach the good faith of the libellant. He has indeed acted very incautiously in advancing his money to pay some charges which are clearly improper to be included in a bottomry bond, but his acts show a want of prudence and of

knowledge of the business he undertook to transact, rather than bad faith. And the fact that a part of the expenses, for which a bottomry bond is given, are improper is not in itself a fraud. The Augusta, 1 Dods. 287.

In respect to the defence of want of communication with the owner, it is necessary to consider the circumstances under which the bond was given. The master, as agent of the owner of the ship, is bound to act with a prudent regard to the owner's interests, and before hypothecating the ship, where other means of raising the necessary funds fail, he is bound to communicate with the owner, if such communication is practicable under the circumstances, without unduly delaying the ship, before he can execute a bottomry bond. The Oriental, 7 Moore, P. C. 398. See, also, The Bonaparte, 8 Moore, P. C. 459; The Onward. L. R. 4 Adm. & Ecc. 57; The Julia Blake [Case No. 7,578]. It has been suggested that this objection goes only to invalidating the stipulation of the bond for payment of maritime interest on the ground that the failure to communicate has only subjected the owner to this extraordinary expense. The Eureka [Id. 4,547]. But, as I understand the cases, it has been held that the communication with the owner, where practicable and prudent under the circumstances, is one of the modes of obtaining funds to which the master must resort and which he is bound to exhaust before that necessity can be said to exist which clothes him with authority as agent of the owner of the ship to make an express hypothecation of the ship by a bottomry bond. This being so, the objection, if well taken in the particular case, must make the contract as a bond invalid for want of authority to execute it. The same principle has been held to apply to a bond hypothecating the cargo, and in respect to the cargo upon a ground which does not apply to the case of the ship, namely; that the owner of the cargo may have the opportunity to exercise his option to take the cargo at the intermediate port upon payment of full freight and indemnifying the ship against expense and loss arising from his retaking it. The Julia Blake, ut supra; The Onward, ut supra; The Lizzie, L. R. 2 Adm. & Ecc. 254. But it is entirely clear as to the cargo and a fortiori as to the ship, that the master is not bound to wait to communicate with the owner, if it is impracticable under the circumstances, or will seriously delay the vessel, having regard to all the circumstances. Perhaps no better test can be applied than this, that in the matter of communicating the master must do what a prudent owner, if personally present, would do under the same circumstances. The Lizzie, ut supra. The failure of the bond for want of communication would not, however, necessarily lead to the dismissal of the libel. since the court may, if it appears that through a mis-

take and without fraud, an attempt to convert a tacit hypothecation under the general maritime law into an express hypothecation by the bond has failed, allow an amendment of the pleadings and enforce the maritime lien. And such practice would especially be proper where the parties, without fault, have, as in this case, been delayed two years in the trial of their case, and have really tried the questions that arise in respect to the maritime lien. The William and Emmeline [Case No. 17,687]; The Eureka, ut supra; Carrington v. Pratt, 18 How. [59 U. S.] 66. Of course this would be impossible if the prior claim did not constitute a maritime lien, as in the case of The Circassian [Case No. 2,724], or in case of an attempted hypothecation of the cargo, where no prior lien exists.

The barque arrived at Cape Town on the 15th of April, in command of Capt. Cummings, who had sailed in her from New York. She had sailed from New York with a cargo of petroleum for Stettin. From Stettin she proceeded to Geffle and from Geffle took a cargo of deals for Cape Town. She put into Madeira in distress and was there repaired, and incurred expense, for which a bottomry bond was executed. She was consigned at Cape Town to one Ardeme. The owner had, before her arrival, sent a power of attorney to a merchant at Cape Town, to attend to the business of the vessel, but for some reason he did not act. Soon after his arrival Capt. Cummings got acquainted with this libellant, Joseph Grady, who was doing business under the name of Joseph Grady & Co., as a ship chandler, and Grady solicited of the captain the business of the ship so far as related to the supplying of ship-chandler's stores. The captain informed Grady that he would have coming from his consignees three or four hundred pounds to spare, which he wished to put into old iron to bring to New York, and asked him to assist in procuring other freight. The vessel seems to have had no business at Cape Town except to deliver her inward cargo and to get such homeward cargo as she could obtain. Soon after his arrival, the master consulted with the libellant in respect to getting a homeward cargo, and by his advice, the ship was advertised in the newspapers for New York, for any freight that might offer. The libellant was then doing business with an American man-of-war, and secured for the barque the carriage of her guns to New York, the freight agreed upon being £100. Cargo did not offer in any large quantity, but some wool and other produce was secured. The libellant arranged with one Wainwright to sell to the master about two or three hundred tons of old iron and about twenty tons were actually delivered and shipped on the barque. This was soon after the delivery of her inward cargo, which took about ten days. But afterwards, upon

settlement of the master's accounts with Ardeme & Co., it was discovered that instead of there being three or four hundred pounds to spare of his freight moneys to invest in cargo, as the master had represented, there was but £37 payable to him. The precise time when this discovery was made does not appear. It was, however, before the 29th of May, when the master died. Up to that time most of the cargo that was obtained at all had been shipped and there was little prospect of any more. From the time that the discovery was made that the master had but £37 at his command, it became evident that he would be in want of funds to disburse the ship in order to prosecute his voyage, unless the freight on the cargo shipped and to be shipped should be sufficient and available therefor. The owner had no agent acting for him and no funds in Cape Town at the master's command. The vessel, on her arrival, needed some slight repairs and supplies and stores for her stay in port and her return voyage, which was ordinarily a voyage of about two months. The apparent necessities of the ship were much short of the amount afterwards secured by the bottomry, £687, for, as will be shown hereafter, many expenses were included therein which were not really necessities of the ship, and after the death of the captain there was a further unexpected delay of the vessel in port, and repairs which had not been anticipated, but which were rendered necessary in consequence of the refusal of the crew to go to sea in the vessel as she was, and the consequent order by a survey of some additional repairs. All this tended to make the ship's disbursements, in fact, larger than seemed probable before the death of Captain Cummings, and before the bills of the vessel were called in by advertisement, which was some time, but how long does not appear, before his death. When the bills were called in it was evident that the master could not obtain the means at Cape Town of disbursing the ship. It is suggested that the freight, in all amounting to about £300, was a fund that he could have used. Upon the evidence, however, I am bound to find that it would not have been possible, at Cape Town, without some collateral security or an indorser, to raise money on the freight. Before Captain Cummings' death he had been arrested at the suit of Wainwright for the price of the old iron delivered to the ship. The libellant paid the bill and costs, amounting, in all, to about £49, and the captain was released, went on board ship and almost immediately died. He seems to have been an intemperate man and had lived on shore while in port and run up considerable bills for his board, for liquor and other unnecessary expenses. Upon the death of the master the libellant advertised for a master, and on the 14th of June Captain Reimer offered his services, and he was accepted and assumed the command of the barque on the 16th of June. It is objected that his appointment was irregular for want of authority on the part of the libellant, and, also, because the vessel had a mate who was competent to act as master and who should have succeeded to the command. It is, indeed, suggested that the libellant designed a fraud on the owner, and for that reason set aside the claims of the mate and procured and installed a master in his own interest who would make no objection to executing the bottomry bond and would aid the libellant's fraudulent designs. As above indicated, the evidence does not sustain this charge. The mate seems to have been set aside because he was, or the libellant was credibly informed that he was, not a suitable man to become captain. In this the libellant may have been mistaken, but it cannot be concluded from such mistake that Captain Reimer, who became, in fact, the master, and who has since been recognized as such by the owner, had not all the customary authority of master from the time he took command of the vessel. Tenders for bottomry on ship and freight were advertised for, but no tenders appeared, and finally the libellant, who had already a large bill for supplies due him, paid the bills of the ship and took the bottomry bond. The vessel sailed from Cape Town on the 12th of July. No communication was had with the owner, except that on the 30th of May the libellant wrote the owner a letter, which was received in New York on the 7th of July, informing him of the death of the master, referring to the claims against the vessel and promising further information by the next mail, which would leave on the 5th of June. This letter is clearly insufficient as a communication, if communication was necessary, because it was not sufficiently distinct as to the necessities of the ship, and by promising further advices, led the owner to await such further intelligence before acting on it, which further intelligence did not come. Captain Reimer also wrote a letter advising the owner of his appointment. The letter of the libellant also referred to the possibility of the freights being sufficient to provide for disbursing the ship without resorting to a bottomry. At that time the bills had not all been presented. The shortest line of communication between Cape Town and New York, at that time, was by mail to Madeira, which left Cape Town once a week by steamer, and from Madeira by telegraphic cable by way of Lisbon and London. By this means of communication messages have been received in New York from Cape Town in fourteen days. The shortest period, therefore, for a despatch from Cape Town and the receipt of a reply, would have been twenty-eight days, but with the chances of having to wait for the mail at Cape Town and Madeira for something less than a week at each

place, the time to be allowed for a communication cannot probably be put at less than thirty-five days. Was it, under all the circumstances, necessary to wait this length of time to get an answer or funds from New York before hypothecating the ship and freight? What would a prudent owner have himself advised, if he had been placed in the same situation in which the libellant and the master were? In considering this question, I think the nature and amount of the necessities of the ship are a very important element. If the repairs required are extensive and the detention of the ship will be necessarily considerable, there are much stronger reasons for consulting the owners, than where the repairs required are trifling and the supplies needed are those ordinarily required for all vessels wherever they may be. The latter is the present case. There was no apparent reason, before Captain Cummings died, why the ship should be detained in port twenty days. His death made some delay, but even then a delay of thirty days was not to be anticipated. The question is not to be judged by the length of time that she actually remained in port. That is conceded to have been unexpectedly prolonged, and it is insisted by the claimant that it was unnecessarily protracted. The expenses, which it was really necessary and proper to include in a bottomry bond, were mostly such as were already secured by a tacit hypothecation of the vessel under the general maritime law, and were not very large in amount with reference to the value of the vessel. Quick despatch of the ship is at all times one of the leading duties of the master and greatly for the interest of the owner. Delay itself, whatever be the object, is attended by great expense. On the whole, I think it would have been for the true interest of the owner and what any prudent owner would, if present, have advised. that the master should, on discovering the necessity therefor, have hypothecated the ship and freight by bottomry on the very easy terms of twenty-five per cent. per annum offered by the libellant, and despatched the ship without waiting for intelligence from New York for thirty-five days or more. The terms offered were easy because the probable maritime interest for the expected voyage of two months would only be about four per cent. That the owner himself was annoyed by the long detention of the vessel at Cape Town is apparent from his letters to the libellant.

The objection as to the bond, so far as it covers expenses which are properly necessaries supplied to the ship, that they were not furnished on the credit of the ship nor in the expectation that a bottomry bond would be given for them, is not tenable. The principle is well established that a party who has supplied a vessel or advanced money upon the personal credit of the own-

er cannot afterwards turn it into a maritime lien against the vessel by taking a bottomry bond for it, but advances made and supplies furnished on the credit of the vessel may be turned into a subsequent bottomry. The Augusta, 1 Dods. 283; The Hebe, 2 W. Rob. Adm. 412; The Yuba [Case No. 18,193]. As to all the bills paid by the libellant for such necessaries, there is no evidence to control the presumption which arises from the fact that they were furnished to the vessel in a foreign port with no apparent means on the master's part to pay them except the vessel and her freight. Nor is there any evidence that any of these parties relied on any thing except the credit of the vessel, which, by the general maritime law, they were entitled to rely upon. As to the libellant, it is true, that during the first part of the time of his supplying the vessel, he may be held to have placed some confidence in the master's statement to him that he had about £300 to £400 to invest in cargo. This plainly implied that he was in funds to disburse the ship, according to appearances at that time. When the libellant began to supply the ship, no agreement was made as to how he was to be paid. He testifies that he supplied her as he did any other vessel. It is uncertain at what time he discovered that the master was really without funds, but it may be assumed that, till this was discovered, he supposed that the master would pay him out of these funds which he represented were coming to him from the consignee of the inward cargo. This statement of the master was either a mistake or an intentional falsehood. Which it was, does not appear. It seems to me, however, that the owner cannot take advantage of this misstatement of the master made to the libellant on his behalf and as his agent, and that as to the supplies furnished while the effect of this misstatement continued, they are properly included in the bond. To hold otherwise would be to encourage fraud.

The question then is one of what items included in the bond should be allowed. The item of £48 2s 6d paid to Wainwright for the price of the iron and costs of suit, is not an expense for which the master could pledge the ship without express authority. It was for purchase of cargo. The master had no apparent authority to buy it, as Wainwright and the libellant must be held to have known. It is suggested that this iron served as ballast. But there is no proof that it was needed as ballast, nor what suitable ballast, if needed, would have cost. The items of cash furnished at various times to the master, £105 12s, must be disallowed. It appears that this money was largely for the master's private use, and it is not proved to have been used for the ship or loaned for the ship's use. The item of £6 9s 6d for cash advanced by Makin, and £6 by Nolan, must be disallowed for the same reasons. The items of "cab hire," "barouche" and

"phaeton," are for personal expenses of the master, and not necessary for the ship, and are disallowed, amounting to £11 6d. This is true of the amounts paid or charged for liquors, £20 12s 6d. Most of it was shown to be for the captain's personal use. None of it is proved to have been necessary for the vessel.

Commissions of an agent properly employed by the master may be included in a bottomry as a necessary part of the expense incurred for the benefit of the ship. I think there was occasion for the master to employ the libellant to get in, settle and pay the bills of the vessel. The Yuba, ut supra. Therefore the libellant's commissions may be allowed on bills properly included other than his own. But it must be held that in supplying stores and provisions at prices charged he charged all that he was entitled to therefor and I see no propriety in his having a commission on his own bill. The item of £4 10s for a set of scales, weights and measures, is not shown to be necessary for the ship and should be disallowed. So the item "rent on guns," £2 15s, of which no explanation is given. Various items for luxuries in libellant's bill, "potted" meats and fruit, also "postages," "knife," "currants," "empty bags," "2 bales oakum," "tobacco," "Shipley's account, £6 6s," "petty charges, £7 10s," are not proved to have been necessary and must be excluded. The stevedore's bill for taking cargo on board is properly included. The test of what may be secured in a bottomry bond is not whether the expense is one for which the creditor will have a maritime lien without any express agreement, but whether it was properly and necessarily incurred by the master in pursuance of his authority as agent of the owner for the prosecution of the voyage. The Yuba, ut supra. The funeral expenses of the master should, I think. be allowed. Where a master of a ship dies in a foreign port without means to defray his funeral expenses and the agent of the ship pays these expenses, humanity and the interests of commerce and the relation of the parties to the vessel justify the treating of the expense as a necessity of the vessel. The George [Case No. 5,329]; Winthrop v. Carleton, 12 Mass. 4. Advertising for a master, for tenders upon bottomry and for the bills against the ship, may be regarded as proper charges, but the expense incurred on this account was excessive. They advertised in all the newspapers in Cape Town. This was wholly unnecessary, and all these bills, except for one paper, must be disallowed. The expense of drawing the bottomry bond and stamps on the same is proper. The objection to the butcher's bill from June 1st to July 10th, £14, that the items are not given, is not well taken. Ordinarily, proper vouchers and bills of items must be furnished. Failure to do so is a suspicious circumstance. But, in this case, the proof is that this party supplied the ship during the period in question; that there was a pass-book in which all items were entered, which the captain held. The detailed account from April 15th to June 1st is produced and the amount of the gross charge from June 1st to July 10th is not out of proportion to the amount for the earlier period. The expenses of the survey which ordered repairs, and the cost of those repairs, are proper charges. The mate has testified that the repairs were unnecessary, but I think the proof is to the contrary. Capt. Cummings's board bills on shore must, of course, be disallowed. The doctor's bills are not proved to have been necessary for the ship. It does not appear that they were for attendance upon the master in his last sickness. It does appear that he died suddenly of heart disease.

If the parties are unable to adjust the account in conformity with these views, the matter may be referred, or particular items may again be brought to the attention of the court, if questions of items have been overlooked. I think that the claimant's point that the prices charged by the libellant are exorbitant is not sustained by the proof.

While I acquit the libellant of all bad faith, yet his careless allowance, as on ship's account, of all sorts of bills, proper and improper, was inconsistent with the exact discharge of the duty he assumed towards the owner in accepting the position of agent of the vessel. The death of Capt. Cummings made it especially incumbent on him to see that the accounts of the ship were properly kept. Every such lender on bottomry, who is also the agent of the ship, must be prepared to justify the loan as to its several parts by proper vouchers and accounts. The Aurora, 1 Wheat. [14 U. S.] 107. In this case not only was the libellant thus negligent of his duty to the ship at Cape Town, but on the arrival of the ship here he demanded full payment of the bond and instantly sued, before the owner fairly had a reasonable opportunity to determine by examination what part of the bond was good and what part was bad. Such conduct, while not constituting bad faith, cannot but receive the disapprobation of a court of admiralty. It is injurious to the interests of trade, and in this case it has rendered litigation necessary to effect what it was the duty of the libellant himself to have done. Therefore, in the exercise of that discretion which is given to the court, the costs must be denied to the libellant.

Decree for libellant for amount to be adjusted under this opinion.